IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2013

**FRANKLIN FITCH v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07320     James M. Lammey, Jr., Judge**

_____

**No. W2012-01465-CCA-R3-PC - Filed March 6, 2014**

_____

The petitioner, Franklin Fitch, was convicted of first degree murder and sentenced to life imprisonment in the Tennessee Department of Correction. Subsequently, he filed a petition for post-conviction relief, alleging that his trial counsel were ineffective. The post-conviction court denied the petition, and the petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Paul K. Guibao, Memphis, Tennessee, for the appellant, Franklin Fitch.

Robert E. Cooper, Jr., Attorney General and Reporter; DeShea Dulany Faughn, Assistant Attorney General, Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The petitioner was charged in the Shelby County Criminal Court with the first degree premeditated murder of Angela Carroll. The proof adduced at trial revealed

> that the [petitioner] and the victim had been involved in a
> romantic relationship. Approximately one month before the
> offense, the victim moved out of their shared home. Although,
> according to the [petitioner], the victim continued to "see" him

several times a week, she also became involved with another man. There is also indication that the victim had filed for an order of protection against the [petitioner]. On the day of the murder, the [petitioner] paid a friend to drive him to the victim's place of employment. He asked employees of the nursing home where he could locate the victim, identifying himself as her boyfriend. Once he located the victim, he kneeled down, drew his gun and began shooting the unarmed victim. He pursued the wounded victim into a bathroom and, despite her cries for help, continued shooting and shouting, "you dirty bitch, you dirty whore, I told you I was going to get you." The [petitioner] placed the weapon in his belt, walked out of the nursing home, and later walked into a fast food restaurant, declaring that he had just shot somebody.

State v. Franklin Fitch, No. W2004-02833-CCA-R3-DD, 2006 WL 3147057, at *15 (Tenn. Crim. App. at Jackson, Nov. 2, 2006).

At the sentencing hearing, the jury found two aggravating circumstances: (1) that the petitioner had previously been convicted of a felony involving violence to the person, Tennessee Code Annotated section 39-13-204(i)(2), and (2) that the petitioner knowingly created a great risk of death to two or more persons other than the victim during the act of murder, Tennessee Code Annotated section 39-13-204(i)(3). See Fitch, No. W2004-02833-CCA-R3-DD, 2006 WL 3147057, at *23-30. Upon finding that the aggravating circumstances outweighed any mitigating factors, the jury sentenced the petitioner to death. Id. at *1. On appeal, this court affirmed the petitioner's conviction but reversed his sentence of death, concluding that the (i)(2) aggravating circumstance was erroneously applied. Id. at *34. Therefore, this court remanded the case to the trial court for a new sentencing hearing.

On remand, the parties entered into an agreement whereby the petitioner would be sentenced to life without the possibility of parole.

Thereafter, the petitioner filed a petition for post-conviction relief, alleging that his trial counsel were ineffective. Specifically, the petitioner contended that counsel failed to fully investigate the case and prepare for trial on the issue of "the short term and long term effects of alcohol on the [petitioner's] ability to form the proper intent or mens rea for the offense of first degree murder."

At the post-conviction hearing, post-conviction counsel announced that the petitioner

declined to testify. Upon questioning by the post-conviction court, the petitioner affirmed that he did not want to testify at the hearing.

The first witness was lead trial counsel, who was a member of the capital defender team of the Shelby County Public Defender's Office. Lead counsel was assisted by co-counsel, who was also a member of the capital defender team, and by a defense investigator.

Lead counsel said he met with the petitioner "very often." He said that the petitioner's level of intoxication at the time of the murder and at the time his statement was given to police was an issue at trial. Records obtained by counsel revealed that on August 7, 1998, the petitioner went to the Memphis Mental Health Institute's crisis management department (MMHI) due to problems with alcohol. However, no complete evaluation was performed because the petitioner stayed only one day. The defense team was unable to find any documentation that the petitioner had received any type of treatment.

Lead counsel stated that he never sought funding for an expert concerning the effect of alcohol use on the petitioner's ability to form intent, explaining, "We had no documentation to suggest long-term intoxication other than the one document from [MMHI]." Lead counsel did not think there was a "particularized need for an addiction expert."

Lead counsel testified that the defense team spoke with the petitioner's family and friends to discern the petitioner's history of alcohol use and abuse, specifically noting that they spoke with Johnny Montgomery and Elvis Bowers. Lead counsel said that Montgomery testified at trial that he had seen the petitioner on the day of the shooting, that the petitioner was drinking beer, and that the petitioner "was not his usual self." Counsel decided not to have Bowers testify because during the investigative interview, Bowers stated that he "didn't know the [petitioner] to use alcohol, and he was surprised when he came to his house with the beer that day." Bowers recalled driving the petitioner to the nursing home, waiting for twenty minutes, and then taking the petitioner home. He was unable to recall anything about the shooting. Bowers said that during the trip, he never noticed that the petitioner had a gun, that the petitioner came out of the nursing home with blood spatter on his pants or shoes, or that the petitioner smelled of gunpowder after the shooting. Accordingly, counsel did not think Bowers was a credible witness.

Lead counsel denied that the petitioner was too intoxicated to give a statement. Specifically, lead counsel observed that Officer Geronimo, who went to the fast food restaurant to arrest the petitioner, said that he saw the petitioner with a beer and that the petitioner had been drinking. Nevertheless, the officer did not "see any evidence of impairment." Lead counsel said that the petitioner was arrested and taken to jail but, based

on the police department's policy, he was not questioned until the next day because he had been drinking alcohol.

Lead counsel said that the defense team had the petitioner evaluated by the Midtown Mental Health Center (Midtown) for competency and sanity. After a thirty-day evaluation, the evaluation team prepared a report summarizing the results. According to the report, the petitioner stated that he suffered from "'[a]lcohol, cocaine, and cannabis abuse.'" The report reflected that during the evaluation, the petitioner complained about hearing voices and that he was prescribed Elavil to "'stop[] the voices.'" The petitioner reported to the evaluation team that he had received treatment in an alcohol and drug program and that he was referred for an inpatient evaluation. The petitioner told the evaluation team that he drank "hard liquor" and that he had consumed two or three six packs of beer a day since he was seventeen to eighteen years old. The petitioner also stated that he used "a hundred dollars worth of crack [cocaine] and ten dollars worth of marihuana" and that he had abused Valium; the petitioner did not reveal the period of time during which he used the drugs. The evaluation team concluded that the petitioner was malingering. Lead counsel said that the defense team was unable to find documentation to support the petitioner's claims.

Lead counsel stated that when this court remanded the case for resentencing, the petitioner agreed upon a sentence of life without parole rather than risk a death sentence.

Co-counsel testified that she was the head of the capital defender team, that the State provided open-file discovery, and that she reviewed all discovery materials. She said that lead counsel made the decision to have the petitioner evaluated and that she agreed with the decision. She said that the defense team would have sought an independent evaluation if they believed "it might garner different results." Additionally, the defense team would have sought expert assistance regarding intoxication

> [i]f there had been more than just one incident of this happening; it might have given us some basis; but there was no indication of any history. We interviewed his family. It says sometimes he got drunk but that he had no history of mental illness, no history of drug abuse, no history of alcohol problems. Just every now and then, he got drunk. So, this was all we had to go on, plus the interviews of his family; so that didn't really steer us into any direction to where we needed to seek outside help. I mean, there was no basis for anyone to evaluate him other than this . . . one-day crisis thing that he went to.

Co-counsel acknowledged that the defense team put on proof about the petitioner's

intoxication on the day of the shooting but denied that counsel found any proof of a history of alcohol abuse. She noted that although the evaluation report stated the petitioner had abused alcohol, the defense team relied on information provided by the petitioner. Co-counsel stated that she was aware the petitioner "had [a] low I.Q. or . . . bad grades" but that he seemed to understand the proceedings. She occasionally thought the petitioner tried to "fake" mental problems "to fool us to try and get some type of defense." However, the petitioner had no difficulty communicating with the defense team.

At the conclusion of the hearing, the post-conviction court found that lead counsel's testimony was "very, very credible." The court found that counsel was aware of Bowers's statement that the petitioner did not habitually drink alcohol. The court observed that "if there's no long-term usage, then, of course, the expert would be worthless. It could actually work against him." The court noted the difficulty of trying to second-guess the tactical decisions made by counsel. The post-conviction court accredited counsels' assertions that there was no reason to call an expert on the effects of alcohol usage. The court found that calling an expert on the effects of alcohol would have had no effect on the outcome of the trial. The court found that the petitioner had failed to prove that counsel were deficient in any respect. In fact, the court stated that "from all indications, they went above and beyond and did their best to defend him." Accordingly, the post-conviction court denied post-conviction relief. On appeal, the petitioner contests this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law

purely de novo.  Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).  Further, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial."  Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

On appeal, the petitioner asserts that

> trial counsel failed to fully investigate, prepare, develop[,] or present[] evidence related to the short term and long term effects of alcohol on the [petitioner's] ability to form the proper intent or mens rea for the offense of first degree murder.  This includes but is not limited to a failure to utilize expert assistance where required.

Initially, we note that although the petitioner contends that trial counsel should have called an expert on the effects of alcohol usage, the petitioner presented no such expert at the post-conviction hearing.  Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."  Black v. State, 794 S.W.2d 752,

757 (Tenn. Crim. App. 1990). We may not speculate on what benefit an expert witness might have offered to the petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id. Accordingly, the petitioner has failed to demonstrate prejudice in this regard.

Further, as the post-conviction court found, trial counsel decided that there was no reason to hire an expert on the effects of alcohol usage. On direct appeal, this court addressed whether the petitioner's alleged intoxication prevented him from having the ability to form the intent to kill:

> The trial court admitted testimony regarding the [petitioner's] alleged use of alcohol prior to and immediately preceding the offense and the court properly instructed the jury that voluntary intoxication could negate the [petitioner's] culpable mental state.
>
> Upon review, we conclude that the defense argument that the [petitioner] lacked the requisite mental state for premeditated murder is not persuasive. The only evidence of intoxication prior to the offense comes from the testimony of Johnny Montgomery. Johnny Montgomery, a lifelong acquaintance of the [petitioner], testified that he observed the [petitioner] around three o'clock on the afternoon of February 28, 2002, walking down the street with a "quart of malt liquor." Montgomery stated that it was not usual for the [petitioner] to drink and that, on this date, the [petitioner] appeared "[r]eal drunk." The state's eyewitnesses at the scene of the shooting all testified that there was no indication that the [petitioner] was under the influence of an intoxicant. Rather, the eyewitnesses at the nursing home all testified that the [petitioner] appeared "calm" and that he was acting with a purpose. The witnesses who testified that the [petitioner] appeared to have been drinking had only observed the [petitioner] after the shooting occurred and they stated that he was only "slightly intoxicated" and not to the point that he did not know what he was doing. In addition, the [petitioner] confessed responsibility for the victim's death to the police and did not admit to being under the influence of alcohol at the time.

State v. Franklin Fitch, No. W2004-02833-CCA-R3-DD, 2006 WL 3147057, at *16 (Tenn. Crim. App. at Jackson, Nov. 2, 2006).

Moreover, counsel testified that there was no proof, other than the petitioner's claims, that he had a history of alcohol abuse. Counsel stated that the petitioner had been found to be malingering, and co-counsel noted that the petitioner occasionally seemed to be trying to "fake" mental or substance abuse problems in order to establish a defense. The trial court accredited this testimony. Although counsel presented at trial proof regarding the petitioner's intoxication at the time of the shooting, the jury chose not to accredit the proof. The post-conviction court found that counsel were not deficient. Nothing in the record preponderates against this finding.

## III. Conclusion

In sum, we conclude that the post-conviction court did not err in denying post-conviction relief. Accordingly, the judgment of the post-conviction court is affirmed.

_____
NORMA McGEE OGLE, JUDGE